Thomas Joseph MROZKA, et al., Appellants (C6–91–1441), Respondents (C9–91–1515, C0–91–1516),

v.

ARCHDIOCESE OF ST. PAUL AND MINNEAPOLIS, Respondent (C6–91–1441, C0–91–1516), Appellant (C9–91–1515).

The CHURCH OF THE IMMACULATE CONCEPTION IN COLUMBIA HEIGHTS, MINNESOTA, et al., Defendants,

and

Diocese of Winona, defendant and third-party plaintiff, Respondent (C6–91–1441, C9–91–1515), Appellant (C0–91–1516),

v.

Thomas ADAMSON, third-party defendant, Respondent.

Nos. C6–91–1441, C9–91–1515 and C0–91–1516.

Court of Appeals of Minnesota.

March 24, 1992.

Review Denied May 24, 1992.

Jeffrey R. Anderson, Mark A. Wendorf, Susan Ford Bedor, Reinhardt and Anderson, St. Paul, for Thomas Joseph Mrozka, et al.

Andrew J. Eisenzimmer, Meier, Kennedy & Quinn, John R. Hoffman, Daniel A.

Haws, Murnane, Conlin, White, Brandt & Hoffman, St. Paul, John D. French, Patrick J. Schiltz, Theresa H. Keninger, Faegre & Benson, Minneapolis, for Archdiocese of St. Paul and Minneapolis.

George F. Restovich, Bruce K. Piotrowski, Patterson–Restovich–Lund Law Offices, Ltd., Rochester, for Diocese of Winona.

Theodore J. Collins, Collins, Buckley, Sauntry & Haugh, St. Paul, for Thomas Adamson.

Considered and decided by
KALITOWSKI, P.J., and RANDALL and MULALLY *, JJ.

## OPINION

KALITOWSKI, Judge.

Following a jury trial, a victim of child sexual abuse was awarded compensatory and punitive damages against religious organizations. The trial court remitted the punitive damages award and the victim appeals. The religious organizations challenge the punitive damages awards as contrary to state public policy and unconstitutional. The victim's parents challenge the trial court's dismissal of their claim for intentional infliction of emotional distress. We affirm.

## FACTS

The Diocese of Winona first learned that Father Thomas Adamson had sexually abused a boy in 1964. The Diocese learned of other sexual misconduct in 1966, 1973, and 1974. Adamson's superiors typically responded to these incidents by reprimanding Adamson, suggesting or insisting that he seek counselling, and transferring him to another parish. In December 1974, Bishop Loras Watters received a number of phone calls from two men who accused Adamson of sexually abusing their brother since the early 1960's. One brother said that Adamson had also abused him, and threatened to expose Adamson if he was not immediately removed. When confronted with the allegations, Adamson admitted

sexually abusing the youth for a period of ten years.

To avoid public disclosure and scandal, Bishop Watters removed Adamson and transferred him to the Archdiocese of St. Paul and Minneapolis. Bishop Watters told Archbishop Roach that Adamson was receiving treatment, but he did not disclose the type of treatment or Adamson's sexual history. In the years that followed, Bishop Watters repeatedly denied Adamson's requests to return to the Diocese. Archbishop Roach, with Bishop Watters' approval, appointed Adamson associate pastor of St. Thomas Aquinas Church in January 1976, and head pastor of Immaculate Conception Church in June 1979. Adamson began abusing Thomas Mrozka shortly after his arrival at Immaculate Conception.

The Archdiocese first learned of sexual misconduct by Adamson in November 1980, when Adamson admitted to attempting to touch a parish boy. Although Archbishop Roach ordered Adamson to be psychologically evaluated, he allowed Adamson to return to his parish pending the evaluation. Adamson agreed to be monitored closely, cease all youth contact, and resign if his misconduct became known. In late December, Archbishop Roach instructed Adamson to resign amid concern that Adamson spent too much time with boys, including Mrozka, and threats by an abused boy's father to go to the police. Also, Bishop Watters had written Archbishop Roach that the latest incident was a "reoccurrence of a long-standing problem." Adamson underwent 19 days of inpatient treatment as a result of this incident. Although Adamson's doctor did not advocate him for a pastorate, both Diocese and Archdiocese officials testified that they understood Adamson could return to his priestly duties. Archbishop Roach appointed Adamson to an associate pastorship and instructed him to avoid youth contact and continue his therapy.

During the ensuing year, the Archdiocese learned that Adamson was having contact with youth, including Mrozka. The

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

violations were, for the most part, ignored. In February 1983, the Archdiocese learned that police had investigated and dismissed charges against Adamson for alleged child sexual abuse. When Archbishop Roach confronted Adamson about violating their agreement, Adamson stated that he had misunderstood the agreement's terms. Roach allowed Adamson to return to his parish, reduced their agreement to writing, and warned that any future violation would result in his immediate removal. In July 1984, Archbishop Roach removed Adamson after Adamson admitted to having sexually abused a boy for a number of years while at St. Thomas Aquinas parish.

Mrozka sued the Archdiocese and Diocese (collectively, the "Church"), alleging that they negligently allowed Adamson to sexually abuse him when he was a minor. His parents sued the Archdiocese alleging, among other things, intentional infliction of emotional distress. The Church admitted negligence. The jury awarded Mrozka $855,000 in compensatory damages and $2,700,000 in total punitive damages. The trial court remitted the punitive damages award to approximately $187,000.

Mrozka appeals the trial court's remittitur. His parents appeal the dismissal of their intentional infliction of emotional distress claim on directed verdict. The Church challenges the award of punitive damages as being violative of state public policy, unconstitutional, and contrary to the evidence.

## ISSUES

I. Does an award of punitive damages against a religious organization violate state public policy?

II. Is an award of punitive damages against a religious organization unconstitutional?

III. Was the award of punitive damages supported by the evidence?

IV. Did the trial court abuse its discretion in granting remittitur?

V. Did the trial court err when it granted a directed verdict on the parents' claim of intentional infliction of emotional distress?

## ANALYSIS

### I.

■ The Church, relying on *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), argues that awarding punitive damages against a religious organization is contrary to public policy. In *City of Newport*, the U.S. Supreme Court held that punitive damages could be awarded against municipal employees, but not against the municipality itself. *Id.* 453 U.S. at 271, 101 S.Ct. at 2762. The Church contends that the same public policy considerations addressed in *City of Newport*, including the concern that the punishment is not a deterrent because it is inflicted on innocent persons rather than the wrongdoers, apply to religious organizations. *See id.* 453 U.S. at 266–70, 101 S.Ct. at 2759–61.

We find the municipal exception from punitive damages in *City of Newport* distinguishable from the Church's proposed exemption for religious organizations. In *City of Newport* the Court found it necessary to determine congressional intent because of its assumption that Congress would have specifically addressed municipal immunity if it meant to alter the long-standing common law rule exempting municipalities from punitive damages awards. *Id.* 453 U.S. at 263–66, 101 S.Ct. at 2758–59. Similarly, the Supreme Court also has looked to congressional intent in holding that punitive damages are not allowed in certain actions against labor unions because of the essentially remedial nature of the National Labor Relations Act. *See International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 2128, 60 L.Ed.2d 698 (1979).

Here, legislative intent is not at issue. There is no common law rule exempting religious or non-profit organizations from punitive damages awards. Punitive damages have been sought against non-profit corporations in Minnesota, although disallowed on other grounds. *See, e.g., Minnesota–Iowa Television Co. v. Watonwan T.V. Improvement Ass'n*, 294 N.W.2d 297, 309–11 (Minn.1980); *Wild v. Rarig*, 302 Minn. 419, 440–42, 234 N.W.2d 775, 789–90

(1975), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Furthermore, punitive damages have been allowed against religious organizations in other jurisdictions. *See, e.g., Bredberg v. Long,* 778 F.2d 1285, 1290 (8th Cir.1985); *Christofferson v. Church of Scientology,* 57 Or.App. 203, 251–53, 644 P.2d 577, 607–08 (1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 439 (1983).

■ If the legislature intended to exempt religious organizations from Minn. Stat. § 549.20 (1986), it could have specifically done so, as it did with municipalities in Minn.Stat. § 466.04, subd. 1(b) (1990). The public policy of the state is for the legislature to determine, not the court. *Mattson v. Flynn,* 216 Minn. 354, 363, 13 N.W.2d 11, 16 (1944). Thus, we decline to create an exemption to the punitive damages statute for religious organizations.

## II.

A. United States Constitution.

■ Although the Free Exercise Clause of the United States Constitution affords an absolute right to hold religious beliefs, it does not absolutely protect religiously based conduct. *Black v. Snyder,* 471 N.W.2d 715, 718 (Minn.App.1991) (citing *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 1599 (1990)), *pet. for rev. denied* (Minn. Aug. 29, 1991). An individual's religious beliefs do not excuse compliance with an otherwise valid and neutral law prohibiting conduct that the state is free to regulate. *Smith,* 494 U.S. at 882–83, 110 S.Ct. at 1602.

The Church argues that Minn.Stat. § 549.20 is not truly neutral and applicable to all because Minn.Stat. § 466.04, subd. 1(b), limits the recovery of punitive damages against municipalities and case law disallows recovery of punitive damages in certain actions. The Church submits that this amounts to a system of individual exemptions to Minn.Stat. § 549.20, and, as a result, the state must extend an exemption in cases of religious hardship absent a compelling state interest. We disagree.

The only statutory exemption for punitive damages pertains to the government's own longstanding immunity. *See* Minn. Stat. § 466.04. Although the common law has typically prohibited the award of punitive damages in certain actions, these prohibitions pertain to the nature of the underlying claim. Furthermore, the state's interest in protecting children from dangerous behavior is sufficiently compelling to justify any indirect burden the Church might incur by having its external actions subject to sanction. *See Prince v. Massachusetts,* 321 U.S. 158, 166–71, 64 S.Ct. 438, 442–44, 88 L.Ed. 645 (1944).

■ The Church also argues that Minn. Stat. § 549.20 violates the Establishment Clause of the United States Constitution because the imposition of punitive damages against a religious organization causes excessive government entanglement with religion. Whether a governmental regulation creates excessive entanglement usually depends on the character and purpose of the institution involved, the nature of the intrusion into religious administration, and the resulting relationship between the government and the religious authority. *Black,* 471 N.W.2d at 720 (citing *Lemon v. Kurtzman,* 403 U.S. 602, 614–15, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971)).

The Church contends that the level of government inquiry is greater when imposing punitive damages than it is when determining compensatory damages in a negligence action. It submits that excessive government entanglement occurs when the reasonableness of its actions relating to a priest's placement or discipline is examined. These areas, according to the Church, involve core questions of church discipline and internal governance, areas that as recognized in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709, 717, 96 S.Ct. 2372, 2380, 2384 (1976), involve an inevitable danger of government entanglement. *Milivojevich* is distinguishable, however, because it involved an internal church property dispute, whereas this case concerns conduct by the Church that resulted in external and secular harm. Such actions are not protected by the First and Fourteenth Amendments. *See General Council on Fin. & Admin. of United*

*Methodist Church v. Superior Court of Cal.,* 439 U.S. 1369, 1372–73, 99 S.Ct. 35, 38, 58 L.Ed.2d 77 (1978) (the Constitution does not prevent a court from independently examining and making a decision regarding the structure and operation of a hierarchical church and its constituent units in a purely secular dispute).

Excessive entanglement is ultimately a question of degree. *Black,* 471 N.W.2d at 721 (citing *Walz v. Tax Comm'n,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)). Here, the Church has conceded that an examination of the reasonableness of its actions and the bases for its decisions regarding the placement and discipline of Adamson is constitutionally allowable for purposes of determining negligence and compensatory damages. We cannot say that examination of these same matters with regard to the possible imposition of punitive damages constitutes excessive entanglement.

■ Finally, the Church argues that inquiring into a religious organization's financial situation creates excessive entanglement. However, here the information relied on to determine the Archdiocese and Diocese's net worth was taken largely from published information. The intrusion was secular and limited in scope and time. We find no excessive entanglement.

B. Minnesota Constitution.

■ Article I, § 16 of the Minnesota Constitution precludes infringement or interference with religious freedom. However, it further states:

[T]he liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.

Minn. Const. art. I, § 16; *see also State v. Hershberger,* 462 N.W.2d 393, 397 (Minn. 1990). The Church's actions as determined by the trial court fall within this exclusion. The repeated placement of Adamson in parishes without restriction arguably condoned acts of licentious behavior and justified practices inconsistent with the peace and safety of the state.

Awarding punitive damages furthers the state's interest in protecting its citizens from harm by deterring and punishing such conduct. *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826, 837 (Minn. 1988). The state is not only concerned with compensating plaintiffs, but also ensuring that similar conduct does not harm others in the future. Here, the unavailability of criminal sanctions and the ineffectiveness of a punitive damages award against the individuals involved support the trial court's determination that an imposition of punitive damages against the Church is appropriate because the state's goals cannot not be accomplished through less restrictive means.

### III.

■ Punitive damages are allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights and safety of others. Minn.Stat. § 549.20, subd. 1 (1986). "Willful indifference" does not imply a purpose of actually intending to harm the plaintiff, but a malicious, reckless or knowing disregard of the plaintiff's rights or safety. *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 381 (Minn.1990); *Wikert v. Northern Sand & Gravel, Inc.,* 402 N.W.2d 178, 182 (Minn.App.1987), *pet. for rev. denied* (Minn. May 18, 1987).

■ The Church contends that punitive damages were not proper in this case because the jury failed to appreciate how little was known about pedophilia at the time the Church made decisions regarding Adamson. The Church argues that it was not "willfully indifferent" to the dangers Adamson posed; rather, it attributes its decisions to its inability to appreciate the extent of Adamson's problem or addiction, its reliance on his doctors' recommendations, and its subjective belief that he would not abuse again.

■ A verdict should be overturned only when manifestly and palpably contrary to the evidence considered in the light most favorable to the verdict. *Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982). Although evidence exists that the Church

tried to act responsibly, there is also evidence from which the jury could conclude that Church officials repeatedly and knowingly placed Adamson ·in situations where he could sexually abuse boys and then failed to properly supervise him and disclose his sexual problem. There was also testimony that the Church avoided dealing with allegations of abuse until public disclosure was threatened. The jury's decision to award punitive damages is supported by the evidence.

### IV.

 Appellant Mrozka argues that the trial court abused its discretion when it granted remittitur. A trial court, however, has broad discretion in determining whether to set aside a verdict as being excessive and should not hesitate to do so where it feels the evidence does not justify the amount, even if the verdict was not actuated by passion and prejudice. *Caspersen v. Webber,* 298 Minn. 93, 100, 213 N.W.2d 327, 331 (1973). The "open-ended and volatile nature of punitive damages" requires a reviewing court to exercise close supervision over the award. *Estate of Hartz v. Nelson,* 437 N.W.2d 749, 757 (Minn.App. 1989) (quoting *Hodder,* 426 N.W.2d at 835), *pet. for rev. denied* (Minn. July 12, 1989).

 When determining whether remittitur is proper, courts should look for proportionality between the egregious misconduct and the amount of damages, keeping in mind the factors set forth in Minn. Stat. § 549.20. *Hodder,* 426 N.W.2d at 837. Because the trial court has the significant advantage of viewing the entire proceeding, some of which is not apparent on the record, an appellate court should not interfere with the court's decision regarding remittitur unless there is a clear abuse of discretion. *Sorenson v. Kruse,* 293 N.W.2d 56, 62 (Minn.1980); *Caspersen,* 298 Minn. at 100, 213 N.W.2d at 331. Where the trial court grants remittitur, noting its reasons for doing so, the appellate courts are not likely to tamper with that determination. *Sorenson,* 293 N.W.2d at 63.

When it granted remittitur, the trial court took into account the total effect of other punishment upon the Church, including damages awarded and settlements in other actions and the extent of negative publicity generated by the trial. Appellant Mrozka argues the trial court was, in effect, reversing the jury on the basis of information and evidence not presented to the jury and that this constitutes an abuse of discretion. We disagree.

 The amount of other settlements and judgments and the nature and extent of media coverage were properly kept from the jury. However, in light of the trial court's responsibility to closely supervise an award of punitive damages, these matters were appropriately considered in granting remittitur. *See Johnson v. Ramsey County,* 424 N.W.2d 800, 807–08 (Minn. App.1988) (the trial court did not err in ordering remittitur where court but not jury had evidence of the defendant's ability to pay), *pet. for rev. denied* (Minn. Aug. 24, 1988). In light of the court's particular knowledge, it found that the damages were excessive and "much larger than necessary to punish and deter." This determination was not an abuse of discretion.

The trial court also specifically addressed the financial condition of the Church, distinguishing its net worth from ·its liquid assets. In light of the unique nature of the assets of the Church, the trial court's analysis of the Church's ability to pay and assessment as to the amount of punitive damages necessary to satisfy the purposes of Minn.Stat. § 549.20 was not an abuse of discretion.

### V.

 The trial court properly directed a verdict on the parents' claim of intentional infliction of emotional distress. While we recognize that the emotional distress suffered by the parents was significant, the trial court properly concluded that it was not sufficient to overcome "the high threshold standard of proof required of a complainant before [the issue] may be submitted to a jury." *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 439 (Minn.1983). Minnesota disfavors tort actions seeking damages for intentional infliction of emotional distress. *Eklund v. Vincent Brass & Aluminum Co.,* 351

N.W.2d 371, 379 (Minn.App.1984), *pet. for rev. denied* (Minn. Nov. 1, 1984). Application of this tort is limited to those cases where the emotional distress is so severe that no reasonable person could be expected to endure it. *Hubbard,* 330 N.W.2d at 439–40.

## DECISION

There was sufficient evidence to support an award of punitive damages against the Diocese and Archdiocese. Such an award of punitive damages against a religious organization is not violative of state public policy or the United States or Minnesota Constitutions. The trial court did not abuse its discretion in granting remittitur, and it did not err in dismissing appellant parents' claim of intentional infliction of emotional distress.

Affirmed.

RANDALL, Judge, concurring in part, dissenting in part.

I concur in part and dissent in part. I concur in the conclusions reached by the majority, including the holding that the punitive damages, if applicable, were not improperly reduced by the trial court. But on the issue of whether public policy allows any award of punitive damages against a recognized religious organization, I dissent. The conclusion is inescapable that the strong and pronounced public policy argument exempting municipalities and labor unions from awards of punitive damages exempts recognized religious organizations as well.

This issue of punitive damages does not involve a question of appropriate compensation. The defendants agree that even on public policy grounds, punitive damages can be assessed against the individual defendants. They also agree that both the individuals and the religious entity they are associated with can be liable for compensable damages. They do not agree, however, that bona fide religious organizations can be liable for punitive damages.

Plaintiff has a right to be fully and properly compensated and has been. Punitive damages, by definition, are not intended as compensation. Rather, they are intended to punish and serve as a deterrence to others. I conclude that punitive damages, as a deterrence to organizations, overstep the bounds of public policy as applied to recognized religions, on the same principles that apply to municipalities and labor unions.

In *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court found that while punitive damages could be recovered against an individual municipality employee, punitive damages could not be awarded against the municipality itself. The Court discussed public policy considerations and found, among other things, that if punitive damages were to be assessed against a municipality, the money would come out of the pockets of the municipal taxpayers, resulting in a downgrading of the municipal services received by residents. The Court found that taxpayers and citizens of a municipality were innocent of any wrongdoing:

> [A]n award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party. * * * [They] are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.

*Id.* 453 U.S. at 267, 101 S.Ct. at 2759–60 (footnote omitted).

The Court also noted that assessing punitive damages against a municipality does not achieve the aim of punishing the individual who committed the act:

> Under ordinary principles of retribution, it is the wrongdoer himself who is made to suffer for his unlawful conduct. If a government official acts knowingly and maliciously to deprive others of their civil rights, he may become the appropriate object of the community's vindictive sentiments. A municipality, however,

can have no malice independent of the malice of its officials. Damages awarded for *punitive* purposes, therefore, are not sensibly assessed against the governmental entity itself.

*Id.* 453 U.S. at 267, 101 S.Ct. at 2760 (citations omitted; emphasis in original).

The United States Supreme Court did not free municipalities from responsibility for compensable damages, and did not free employees of the municipality, as individuals, from punitive damages. It simply carved out for the municipality itself the one exception defendants here seek, an exemption from an assessment of punitive damages.

Relative to labor unions, the United States Supreme Court followed the same logic. In *International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the Supreme Court declined to allow punitive damages to be inflicted upon a union for a breach of duty to represent a member. The Court found that the award would penalize the very union members that the law mandating fair representation was intended to protect. *Id.* 442 U.S. at 50–51, 99 S.Ct. at 2127. The Court was concerned that punitive damages awards would burden the exercise of rights granted under federal labor law. *Id.* 442 U.S. at 51–52, 99 S.Ct. at 2127–28. The Supreme Court refused to burden unions "beyond the extent necessary to compensate employees for their injuries." *Id.* 442 U.S. at 50, 99 S.Ct. at 2126. I suggest that the allowance of punitive damages against religious organizations would unduly burden the free exercise of first amendment rights established by the United States Constitution.[1]

Given the priorities adopted by the federal government and by individual states, the right of citizens in a community to form a municipality, and the right of workers to organize a labor union are firmly established. I suggest that the first amendment right of the federal constitution guaranteeing to the people freedom of religion and religious organizing is equally firm. The

public policy in *City of Newport* and *Foust* is sound. It should also be applied to established religion.

Both sides agree that present Minnesota law does not, with specificity, allow or disallow the assessment of punitive damages against recognized religion. It could be argued that the lack of a specific right to a punitive damages award against them by plaintiffs means that they do not have that right. It could be argued that the lack of a specific prohibition against assessing punitive damages against a religious organization means it can be done until the legislature speaks to it.

I suggest the overall intent to be gleaned from legislative enactments and prior Minnesota case law addressing the importance of taxpayers' rights, union members' rights, and the rights of religious organizations supports the conclusion that Minnesota public policy bars the assessment of punitive damages against an organized religion.

[1]. The first amendment of our federal constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the free-

dom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

U.S. Const. amend. I.