Nos. 94-3216, 95-1419, 95-1422 and 95-1425

Diocese of Winona, a Minnesota          *
non-profit religious                    *
corporation,                            *
                                        *
          Plaintiff-Appellee/           *
          Plaintiff/                    *
          Plaintiff/Appellant,          *
                                        *
     v.                                 *
                                        *
Interstate Fire & Casualty              *
Company;                                *
                                        *
          Defendant-Appellees,          *
                                        *
Those Certain Underwriters at           *
Lloyd's, London, signatory to           *
Policies Nos. SL 3402 and               *
SLC 5421;                               *
                                        *
          Defendant-Appellant,          *
                                        *
Interstate Fire & Casualty              *     Appeal from the United States
Company; Those Certain Under-           *     District Court for the
writers at Lloyd's, London,             *     District of Minnesota.
signatory to Policies Nos.              *
SL 3402 and SLC 5421;                   *
                                        *
          Defendants-Appellees,         *
                                        *
Centennial Insurance Company,           *
                                        *
          Defendant,                    *
_____*
                                        *
Archdiocese of St. Paul and             *
Minneapolis; Church of the              *
Immaculate Conception, in               *
Columbia Heights, Minnesota;            *
Church of the Risen Savior, in          *
Apple Valley Minnesota,                 *
                                        *
          Plaintiffs-Appellees/         *
          Plaintiffs-Appellants/*
          Plaintiffs,                   *
     v.                                 *
                                        *

Underwriters at Lloyd's, London;*
                               *
        Defendants-Appellants/*
        Defendants-Appellees,    *
                               *
Underwriters at Lloyd's, London;*
Interstate Fire & Casualty      *
Company; Aetna Casualty and     *
Surety Company,                 *
                               *
        Defendants-Appellees,    *
                               *
Interstate Fire & Casualty      *
Company; Aetna Casualty and     *
Surety Company,                 *
                               *
        Defendants-Appellees,    *
                               *
Underwriters at Lloyd's, London;*
Interstate Fire & Casualty      *
Company;                        *
                               *
        Defendants-Appellees,    *
                               *
Aetna Casualty and Surety       *
Company,                        *
                               *
        Defendant-Appellant.     *

_____

Submitted:  February 12, 1996

Filed:  July 31, 1996
_____

Before McMILLIAN, LAY and HANSEN, Circuit Judges.

_____

LAY, Circuit Judge.


     Underwriters at Lloyd's, London and Centennial Insurance Company
(Lloyd's) appeal from the district court's grant of a declaratory judgment
that the Diocese of Winona and the Archdiocese of St. Paul and Minneapolis
are entitled to insurance coverage for compensatory damages awarded by a
state court jury to Thomas Mrozka who had been sexually abused by a priest,
Father Tom Adamson.

-2-

The primary basis of the present appeal by Lloyd's, joined by cross-appellant Interstate Fire and Casualty (Interstate), is that the abuse was "expected" by the insureds, thus, there was no coverage within the terms of their insurance policies. The Diocese and the Archdiocese, as well as Interstate and Aetna Casualty and Surety (Aetna), have filed cross-appeals relating to the allocation of coverage among the three carriers and the payment of attorneys' fees. The Diocese and the Archdiocese also appeal the number of "self-insured retentions" they must pay. We hold that the district court erred in finding coverage by Lloyd's and Interstate throughout the period Mrozka was abused. We discuss the remaining claims on appeal relevant only to that holding. We affirm in part, reverse in part, and remand to the district court.

## BACKGROUND

The circumstances surrounding the underlying dispute relate to a pedophilic priest who subjected numerous children to prolonged periods of sexual molestation. The detailed facts of this case are set forth in detail in the district court's opinion, Diocese of Winona v. Interstate Fire & Casualty Co., 858 F. Supp. 1407 (D. Minn. 1994), and the state court's opinion in the underlying litigation, Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806 (Minn. Ct. App. 1992).

### The Employment of Father Adamson

From 1958 until 1975, Father Adamson served as a priest in various school and parish assignments in the Diocese of Winona. In 1975, the Diocese transferred Adamson to the Archdiocese, where he served in different positions until January 1985. Adamson's ministry was terminated by the Archdiocese in 1985 because of publicity and litigation surrounding a sexual abuse claim unrelated to Mrozka's suit. While Adamson remained a priest, he did not serve at another parish in the Diocese or Archdiocese after 1985.

Mrozka sued the Diocese and Archdiocese, alleging that they negligently and recklessly supervised Adamson, allowing Adamson to sexually abuse Mrozka when he was a minor. Both the Diocese and the Archdiocese conceded negligence but disputed their recklessness. Mrozka, 482 N.W.2d at 810. The jury awarded Mrozka $821,250 in compensatory damages and, finding recklessness, awarded $2,700,000 in punitive damages. The punitive damages award was later reduced to $187,000,[1] which was upheld on appeal.[2] The parties involved paid the judgment pursuant to an interim funding agreement which preserved their rights against each other. Diocese, 858 F. Supp. at 1413.[3]

## The Insurance Policies

During the period Mrozka was abused, the Diocese and the Archdiocese had standard Comprehensive General Liability (CGL)

---

[1]The district court ruled that the punitive damages award was not covered by the insurance policies, and neither the Diocese nor the Archdiocese appeals this ruling.

[2]In this regard, the Minnesota Court of Appeals found sufficient evidence "from which the jury could conclude that Church officials repeatedly and knowingly placed Adamson in situations where he could sexually abuse boys and then failed to properly supervise him and disclose his sexual problem." 482 N.W.2d at 813 (emphasis added). The court found that this evidence constituted "clear and convincing evidence that the acts of the defendant[s] show a willful indifference to the rights and safety of others" sufficient to justify punitive damages. Id. at 812.

[3]The jury in the underlying state court action was not asked to apportion fault between the Diocese and Archdiocese; rather, defendants stipulated between themselves that the Archdiocese is liable for 45 percent and the Diocese for 55 percent of the compensatory damages. Although none of the insurers is a part of this stipulation, none challenge it. Diocese, 858 F. Supp. at 1413.

policies, covering, among other things, personal injury. Each of the policies is an "occurrence" based policy.[4]

Aetna insured the Archdiocese from July 1, 1979 through August 30, 1980. Aetna's policy covers "ultimate net loss in excess of . . . $10,000 which the insured shall become legally obligated to pay as damages because of . . . personal injury . . . caused by an occurrence." An occurrence is defined as "an accident, including continuous or repeated exposure to conditions, which results in personal injury . . . <u>which is neither expected nor intended from the standpoint of the insured</u>[.]" Aetna's App. at 106 (emphasis added). The policy applies only to personal injury "which occurs during the policy period," and has a $3,000,000 limit of liability for each occurrence.

On September 1, 1980, the Archdiocese replaced Aetna's program with a Protected Self-Insurance Program. Under this program, the Archdiocese served as a self-insurer up to $100,000 per occurrence. This feature is known as a "self-insured retention," or "SIR." The Archdiocese purchased two layers of insurance for losses in excess of the SIR. Lloyd's provided the first layer, with a limit of $100,000 per occurrence, and Interstate provided the second, with a limit of $4,800,000 per occurrence. Accordingly, in the event of a covered loss for $5,000,000, the Archdiocese would be liable for the first $100,000, Lloyd's would be liable for the next $100,000, and Interstate would be liable for the next $4,800,000. Any losses greater than $5,000,000 would be uninsured.

Lloyd's policies are similar to Aetna's in that they cover damages "on account of personal injuries . . . arising out of any occurrence happening during the period of insurance." In language

---

[4]Occurrence-based policies, the traditional form of CGL insurance, cover any occurrence that happens within the policy period, regardless of when the insured submits the claims. <u>See</u> <u>Hartford Fire Ins. Co. v. California</u>, 509 U.S. 764, 771 (1993).

similar to that in Aetna's policy, the Lloyd's policies define an occurrence as "an accident or a happening or event or a continuous or repeated exposure to conditions <u>which unexpectedly and unintentionally results in personal injury</u> . . . during the policy period."  Aetna's App. at 138 (emphasis added).  Lloyd's policy periods were one year long and began on September 1.  Beginning on September 1, 1986, Lloyd's policies specifically excluded coverage for personal injury caused by sexual abuse.

Interstate's policies generally incorporated the terms of Lloyd's policies.  For purposes of this litigation, the only difference between Interstate's and Lloyd's policies is that Interstate's included a sexual abuse exclusion beginning on September 1, 1985, a year earlier than Lloyd's.

The insurance purchased by the Diocese throughout the relevant period was essentially identical to the Archdiocese's Protected Self-Insurance Program.  The insurers were Lloyd's and Interstate.  The primary differences are that the Diocese's policy periods began on July 1 of each year; its SIR per occurrence was $75,000 before July 1, 1983; and its SIR per occurrence was $100,000 after that date.  Lloyd's covered the next $125,000 per occurrence up to July 1, 1983, after which it covered the next $100,000.  In all of the relevant policy periods Interstate covered the next $4,800,000 per occurrence.  Aetna did not insure the Diocese at any time relevant to this appeal.

OCCURRENCES

The district court found the damage resulting from abuse was not "expected", thus, there was an "occurrence" within the time period of each policy.  Based on <u>Northern States Power Co. v. Fidelity & Casualty Co.</u>, 523 N.W.2d 657 (Minn. 1994) ("<u>NSP</u>"), the district court concluded that Adamson's abuse constituted a number of occurrences which merged into "one continuing occurrence."  As

such, the court found coverage was afforded by each policy of the various insurers, except for the policy periods that contained a sexual abuse exclusion.[5]

---

[5]Lloyd's urges that since there was only "one continuous occurrence," it should be responsible for at most one insurance policy limit. This misreads the district court's opinion as well as NSP.

The district court found the reasoning of NSP, involving environmental contamination producing one continuous occurrence, was analogous to the repetitive sexual abuse by Adamson. In understanding this analysis, it is important to separate the occurrence from the injury in fact. The occurrence results in the injury, but the events constituting the occurrence are distinct from the resulting injury. In the context of the present case, the occurrence is the continuous and repeated exposure of Mrozka to the negligent supervision of Father Adamson by both the Diocese and the Archdiocese. The abuse is the actual injury, not the occurrence. Under Minnesota law, it is the time of the actual injury within the effective dates of the policy which triggers the policy. See NSP, 523 N.W.2d at 662. As Judge Weinstein explained in his thorough discussion of the number of occurrences in the Agent Orange case, "the fact that an occurrence takes place at the same time as one or more policy periods is irrelevant to coverage, since it is the time of injury that triggers coverage." See Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1392 (E.D.N.Y. 1988). The "occurrence" and the "injury" it produces need not have any relationship to each other in time or place. See id. at 1387. In other words, the time of the occurrence producing the injury is irrelevant to the triggering of the policy.

This analysis by the district court is relevant to determining the number of SIRs to be applied in each policy period. NSP and Uniroyal, in effect, create a legal fiction that a single, continuous occurrence spanning multiple policy periods constitutes a single occurrence in each policy period. See Uniroyal, 707 F. Supp. at 1393; NSP, 523 N.W.2d at 664. In Uniroyal, the insurance carrier urged that each injury constituted a separate occurrence. Judge Weinstein rejected that view. He made clear that an ongoing exposure to a hazardous condition must be treated as a single, continuous occurrence to avoid the absurd situation where a condition causing hundreds of thousands of injuries would constitute hundreds of thousands of occurrences, forcing the insured to pay for hundreds of thousands of SIRs. 707 F. Supp. at 1383. In both NSP and Uniroyal, the insured paid one SIR per policy period.

Lloyd's and Interstate, however, assert that the damages arising from Adamson's abuse was not covered because (1) the jury's finding of recklessness in the state action collaterally estops the Diocese and the Archdiocese from arguing they did not expect the abuse, and alternatively, (2) the Diocese and the Archdiocese expected the abuse within the meaning of the insurance policies, thus, there was no occurrence and no coverage. We agree with the district court's analysis finding that collateral estoppel does not apply,[6] thus, we pass directly to the second issue as to whether the Diocese and the Archdiocese expected, within the terms of the policies, the sexual abuse.

Each of the insurance policies defines "occurrence" in a similar fashion. An "occurrence" requires an injury or event or happening resulting in injury that is neither expected nor intended by the insured. Although Lloyd's and Interstate do not assert the Diocese and the Archdiocese intended that Adamson abuse Mrozka, they do argue those damages were "expected" under the terms of the policies. Interpreting Minnesota case law, this court has stated:

> "For the purposes of an exclusionary clause in an insurance policy the word 'expected' denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions . . . The results cease to be expected and coverage is present as the probability that the consequences will follow decreases and becomes less than a substantial probability."

---

[6]The district court correctly reasoned that the finding of the state court jury of "recklessness" by the Diocese and the Archdiocese, for purpose of awarding punitive damages, is a separate and distinct issue from insurance coverage. See Diocese, 858 F. Supp. at 1417-19 (recklessness reflects degree of culpability--such as an unreasonable but slight risk of extreme harm--rather than likelihood of occurrence); but cf. Ohio Casualty Ins. Co. v. Terrace Enters., Inc., 260 N.W.2d 450, 452-53 (Minn. 1977) (suggesting in dicta that a reckless act may not constitute an occurrence).

Auto-Owners Ins. Co. v. Jensen, 667 F.2d 714, 720 (8th Cir. 1981) (quoting City of Carter Lake v. Aetna Casualty & Sur. Co., 604 F.2d 1052, 1058-59 (8th Cir. 1979)); accord Bituminous Casualty Corp. v. Tonka Corp., 9 F.3d 51, 53 (8th Cir. 1993), cert. denied, 114 S. Ct. 1834 (1994); see also Continental W. Ins. Co. v. Toal, 244 N.W.2d 121, 125 n.3 (Minn. 1976). This standard involves a higher degree of certainty than reasonable foreseeability. Tonka, 9 F.3d at 53.

The issue then is whether a reasonably prudent person in the position of the Diocese and the Archdiocese knew or should have known that Adamson's abuse of Mrozka was substantially probable as a result of the continuing exposure caused by their willful indifference. See Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co., 480 N.W.2d 368, 372 (Minn. Ct. App. 1992). In defining substantial probability, this court has stated, "[t]he indications must be strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur." Carter Lake, 604 F.2d at 1059 n.4.

The district court determined that at some point before Mrozka's abuse in 1979 Adamson was "more likely than not" to continue to abuse boys, however, the court was unable to conclude that a reasonable person would have determined before January 1985 that further pedophilia on Adamson's part was "substantially probable or highly likely to occur." Diocese, 858 F. Supp. at 1419. We disagree.

The Diocese and the Archdiocese argue that this court may not reverse the district court finding that the abuse was not substantially probable unless such finding can be said to be clearly erroneous. See, e.g., Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98 (3d Cir. 1981). However, this argument overlooks that the district court's conclusion--that Adamson's

abuse of Mrozka was not substantially probable--is a mixed question of fact and law. Here the facts are undisputed. Where the facts upon which liability is claimed or denied under an insurance policy are undisputed and the existence or amount of liability depends solely upon a construction of the policy, the question presented is one of law and this court reviews the finding de novo. See Tonka, 9 F.3d at 52; Auto-Owners, 667 F.2d at 721.

## Substantial Probability

A review of Minnesota and Eighth Circuit decisions recognizes the fundamental premise that an insurance policy protects an insured from fortuitous loss.[7] For example, if a building contractor suffers a loss because of unknowing mistakes or carelessness, the resulting damage is intended to be covered. If, however, the loss is incurred due to intentional acts, no coverage is intended. See Bartlett, 240 N.W.2d at 313 (holding that contractor who knowingly violated contract specifications consciously controlled risk of loss, precluding an "occurrence"). While an insured has a reasonable expectation in securing a CGL policy that the policy will cover some negligent acts, it does not necessarily follow that all negligent acts are covered. This court has held under Minnesota law that there may be instances when, although an insured was negligent, she knew or should have known that resulting damage was expected. See Auto-Owners, 667 F.2d at 719. The difference between damages that are reasonably foreseeable and damages that are substantially probable is one of degree of expectability. Id. at 720.

---

[7]Insurers distribute losses among large numbers of policyholders. They are able to properly set premiums and supply coverage only if those losses are uncertain from the standpoint of any single policyholder. If a single insured is allowed to consciously control the risks covered by the policy, a central concept of insurance is violated. Bituminous Casualty Corp. v. Bartlett, 240 N.W.2d 310, 313 (Minn. 1976), overruled on other grounds, Prahm v. Rupp Const. Co., 277 N.W.2d 389 (Minn. 1979).

Thus, for example, this court held under the substantially probable test that if an insured is alerted to a problem, its cause, and knows or should have known of the likelihood of the problem's reoccurrence, it cannot ignore such problem and then look to its insurer to reimburse it for the liability incurred by reason of such inaction. Carter Lake, 604 F.2d at 1059 (no occurrence where city failed to repair sewer equipment after repeated equipment failures and took calculated risk that loss would not occur). Relatedly, if an insured undertakes a course of action, knows of the substantial risks involved, proceeds in light of this knowledge, and disregards the known hazard, the Minnesota Court of Appeals has held that no "occurrence" will lie. Farmers Union Oil Co. v. Mutual Serv. Ins. Co., 422 N.W.2d 530, 533 (Minn. Ct. App. 1988) (no occurrence for damage to crop where farming cooperative sprayed non-approved herbicide with knowledge that use of the mixture was illegal and that there was a chance the mixture would kill the crop).[8]

This court recently applied these concepts to determine whether damage was "expected" in Tonka. In Tonka, a manufacturer knowingly dumped manufacturing solvents in its parking lot and on

---

[8]The Minnesota Court of Appeals cited with approval the district court's conclusion that notwithstanding the fact that "no damage of any sort was intended," the cooperative was reckless and there was no occurrence:

> In the current case, the insured had full access to product use instruction and knew for a fact that the requested use [was not federally approved]. [The co-op's] employees knew the requested herbicide was often used to kill the crop now being claimed as a loss. The resultant damage should have been highly expected and a contrary belief is absurd in light of the admitted knowledge of the insured. . . . The knowledge of the insured implies a high expectation of crop damage that is not an occurrence under the insurance policy now at issue.

Farmers Union, 422 N.W.2d at 532 (quoting district court).

adjacent land notwithstanding its knowledge that dumping the solvents on-site was dangerous to humans and environmentally harmful.  We stated:

> In these circumstances, we agree with the district court that Tonka knew or should have known that there was a substantial probability that its on-site dumping of liquid wastes containing TCE and other solvents would cause property damage.  Therefore, the damage that did result was "expected" <u>as a matter of Minnesota law,</u> and there was no covered "occurrence" under the Insurers' policies.

<u>Id.</u> at 54 (emphasis added).  With these concepts in mind, we now turn to the basically undisputed facts.

<u>The Diocese</u>

The record shows that prior to Adamson's abuse of Mrozka in 1979, there were eight separate cases of sexual abuse or attempted abuse reported to the Diocese and admitted to by Adamson.  The admitted abuse began in 1961.  In 1964, the Diocese first learned that Adamson, in that same year, had attempted to sexually molest a boy on five or six occasions.  Adamson admitted to the Vicar General of the Diocese that he had touched the youth.  Tr. at 762-76.  In 1966, the Diocese learned of an incident in which Adamson asked two boys to disrobe.  The boys reported the incident to a priest in the Diocese; Adamson again admitted the solicitation.  In 1973, Adamson tried to grab a boy's genitals while they were in a swimming pool.  The boy told a priest about the attempted abuse, who in turn told the Bishop of the Diocese.  At the time same, the Bishop received an anonymous phone call about Adamson's association with boys.  Once again, Adamson admitted the attempted abuse.  In 1974, while sitting in a sauna or swimming pool, Adamson touched another boy's genitals.  This boy told others.  The Bishop again met with Adamson who admitted the abuse.  In addition, in 1974, the Diocese received additional reports that Adamson had sexually

abused and victimized over twenty children since 1964. In 1974, the Bishop also learned that Adamson had been sexually abusing a boy for over ten years. In response to this report by the victim's brother, Adamson admitted to sexually abusing the youth, and also admitted there had been another "problem" with a "younger person" in the early 1960's. Tr. at 1211.

Thus, within the fifteen years prior to Adamson's abuse of Mrozka, the Diocese was alerted to Adamson's sexual abuse of boys which occurred as a direct result of the Diocese's inadequate supervision. In response to these incidents, the Diocese failed to take adequate remedial measures. The typical response was to transfer Adamson to another school or parish, where he continued to have access to and sexually molest children. Furthermore, although the Diocese required that Adamson receive treatment for his pedophilia as early as 1966, the Diocese was fully aware this treatment was not effective because Adamson continued to abuse children. On two separate occasions in 1974, the Personnel Board of the Diocese noted that Adamson was "having a recurring problem" and needed in-patient treatment. Pl. Tr. Exh. No. 3. Even after Adamson underwent in-patient treatment, the Diocese knew it was ineffective. Upon conclusion of Adamson's in-patient treatment, one of his doctors said that Adamson was only "slightly improved." Tr. at 1731. Indeed, the Diocese itself was more than merely skeptical that Adamson was rehabilitated. The Bishop testified that he "didn't have any confidence" in the treatment program that Adamson attended. Tr. at 1218. Furthermore, in spite of the importance Adamson's doctors placed on continuing out-patient therapy, the Diocese knew that Adamson was not continuing his therapy. In response to questioning by a nun about Adamson's sexual molestation of a youth, the Bishop stated that although Adamson had received the finest treatment available, Adamson himself admitted that he was unable to control himself. Moreover, in 1975, the Bishop concluded that there were questions about

Adamson's relationships with boys in <u>each</u> of the communities in which he had served.

In 1975, the Bishop pressured Adamson into taking a leave of absence to undergo counseling in St. Paul, transferring him to the Archdiocese. The Bishop refused to reappoint Adamson in the Diocese until Adamson's counselor made the recommendation that the treatment program had been effective, and that Adamson could be responsibly entrusted with pastoral care. The Bishop testified that in formulating this decision he felt the needs of Adamson needed to be balanced against the needs of all people in the diocese, including the needs of the parishioners "of whatever age" to be free of Adamson's "sexuality problem." Tr. at 1297. Notwithstanding the Bishop's refusal to appoint Adamson to another parish in the Diocese until he could be entrusted with pastoral care, the Archbishop, with the Bishop's approval, appointed Adamson associate pastor of St. Thomas Aquinas Church in 1976, and head pastor at Immaculate Conception Church in 1979. Adamson, while he was a priest at Immaculate, began abusing Mrozka in October 1979. The abuse of Mrozka continued on a frequent basis until the spring of 1984, and thereafter on a sporadic basis until 1987.

In light of these undisputed facts, we hold as a matter of Minnesota law that Adamson's abuse of Mrozka was expected by the Diocese for purpose of determining whether there was an occurrence under the policies in question. A reasonably prudent person in the position of the Diocese should have known there was a substantial probability that Adamson would continue to sexually abuse children. The Diocese knew of Adamson's sexual abuse of boys over fifteen years. The Diocese knew it was recurring. The Diocese knew treatment was ineffective. The Diocese knew Adamson could not control himself. The Diocese knew that he had molested boys in each and every parish in which he served, yet allowed Adamson to be placed in the Archdiocese in situations where he could continue to abuse. The fact that the Diocese transferred Adamson to the

-15-

Archdiocese in light of the needs of youthful parishioners to be free from Adamson's "sexuality problem" severely undermines the Diocese's assertion that further abuse was not substantially probable. A review of the record as a whole contain overwhelming evidence that the Diocese knew or should have known that Adamson's continued sexual abuse was highly likely to reoccur. Under the circumstances, we hold as a matter of law there was no occurrence within the meaning of the Diocese's insurance policies, and consequently, no insurance coverage is available to the Diocese for damages arising from Adamson's abuse of Mrozka.

The Archdiocese

After being transferred to the Archdiocese from the Diocese, Father Adamson came to Minneapolis in 1975 to continue sexual counseling and to complete his degree work. The district court found, on conflicting evidence, that the Archbishop "apparently did not learn of [Adamson's

pedophilia] until late 1980."  <u>Diocese</u>, 858 F. Supp. at 1410.[9]  However, the Bishop also testified that he

---

[9]Other evidence suggested the Archbishop was informed of Adamson's pedophilia as early as January 1975.  Specifically, in an October 1984 letter to the Archbishop, the Bishop wrote:

> I am very sorry that Father Adamson's many talents continue to be compromised because of his involvement with juvenile males; and all the more so now that his irresponsible conduct has now become a matter of public record. . . .  As you will recall, when I asked you to consider helping Father Adamson in January of 1975 I indicated that I could no longer ask him to accept pastoral responsibilities in the Winona Diocese because of this same type of problem.

Tr. at 1258-59.  At trial, the Bishop was asked,

> [W]hen you say, "because of this same type of problem," you are referring here to, are you not, Father Adamson's involvement with juvenile males?
>
> A.  Yes.  I would include [a previously abused juvenile male] in that statement.
>
> Q.  Right.  And you are saying here that when you asked Archbishop Roach to consider helping Father Adamson in January '75, you indicated to him that you could no longer ask him to accept responsibility for that reason?
>
> A.  Well again, I guess that's the indirection of my first letter to Archbishop Roach that I did not spell -- simply said he was coming to the Cities to be involved in this consultation services program.  And in -- that is as specific as I became with Archbishop Roach.

<u>Id.</u> at 1259.

-17-

wrote the Archbishop a letter emphasizing Adamson's continued need for therapy. Tr. at 1263. Further, the Bishop testified that while he never told the Archbishop that Adamson "needed help," it was his perception that "the implication would be that if he's in therapy there must be a problem." Tr. at 1264.

In November 1980, it is undisputed the Archdiocese learned of Adamson's pedophilia. Two boys notified a priest that Adamson had fondled a young boy in a whirlpool. Within the next week, the father of the boy met with the priest, and indicated he was concerned that several other youths, all the same age as the fondling victim, may have been assaulted by Adamson and gave the priest their names. The priest reported this incident, among others, to the Chancellor of the Archdiocese. In the Chancellor's meeting memorandum, prepared in November 1980, it is reported that "Father Adamson has a number of young people stop to see him. They usually use the private entrance of the pastor and their presence is never mentioned." Tr. at 1776. Additionally, it is reported that Adamson had two 13 or 14 year old boys spend the night in September or October of 1979, and that this was known at the time to both the priest and the housekeeper at Immaculate Conception.[10]

_____

[10]Father Wajda, a priest at Immaculate Conception, testified as follows:

> Well, I woke up in the morning and I was going out of my room and across the hall are two guest rooms. At that particular time I heard noise in one of the guest rooms and I was not aware that there had been any house guests to come to stay the night before. And a little bit later on, the two boys had come out of that room.

Tr. at 1777.

Furthermore, there was a report of Adamson taking showers with a number of young boys on an afternoon when there was no school, which was reported to the Chancellor at the time it occurred. Tr. at 1779. The report also stated that "[Father Adamson] frequently takes young boys to the YMCA and . . . fewer and fewer want to go, and find more and more excuses not to." Tr. at 1781. Finally, the report stated that Father Wajda reported to the Chancellor that "[t]here are a number of other things -- taking a young boy by the name of Tom Maruska [sic] for overnights in Rochester. A kind of world that centers on young boys and some late night going out and having visitors in." Id.

After Adamson fondled the boy in the whirlpool in November 1980, the Archbishop wrote to the Bishop of Winona in December 1980, stating that Adamson had sexually molested a youth at Immaculate Conception, and that Adamson would have to resign. The Bishop responded that he understood that there was no alternative and that he "insisted on the same procedure in January of 1975 after it became evident that the Hartford [treatment] program had been rather pro forma." Tr. at 1323-24 (emphasis added). The Bishop further wrote, "Naturally, I'm very sorry that the problem reoccurred . . . ." Tr. at 1326 (emphasis added). In response to the Archbishop's indication that Adamson would again be entering a treatment program, the Bishop responded to the Archbishop "[p]lease God, [let] this present program . . . help him resolve this long standing problem." Id. (emphasis added). Adamson entered an in-patient treatment program, and was assigned by the Archbishop to another parish within six weeks.

We hold that Adamson's abuse of Mrozka was expected within the meaning of the Archdiocese's insurance policies as of December 1980. The Archdiocese had received numerous reports of abuse by Adamson. The Archdiocese knew he fondled a boy in the whirlpool. The Archdiocese knew Adamson had young boys spend the night and that Adamson engaged in a "kind of world that centers on young boys and some late night going out and having visitors in." Mrozka was identified as one of the boys. Furthermore, as of December 1980, the Archbishop knew from the Bishop of the Diocese that Adamson had previously been in treatment for a "longstanding" and "reoccurring" problem, and knew, based on the more recent incidents, that previous treatments under the direction of the Diocese had not been effective. Nonetheless, the Archdiocese disregarded these known risks by placing Adamson in another parish and continuing to provide inadequate supervision, such that Adamson was able to continue abusing Mrozka. The actions of the Archdiocese were repeated and knowing. See Mrozka, 482 N.W.2d at 813. A review of the record as a whole contains overwhelming evidence that the Archdiocese knew or should have known that personal injury from child sexual abuse by continuing to allow Father Adamson's access to children was highly likely to occur. Under the circumstances, we hold there was no insurance coverage available to the Archdiocese after December 1980 for damages arising from Adamson's abuse of Mrozka.

Having decided that the repeated exposure of Mrozka to Adamson resulting in abuse of Mrozka was expected by the Diocese at all relevant times, we find no insurance coverage was afforded to the Diocese. We also find the injury from the same exposure to conditions was not unexpected by the Archdiocese after December 1980. Under these circumstances, we must determine the extent to which the Archdiocese's insurance policies cover the damages incurred.

Allocation

The parties agree that Mrozka's abuse began in October 1979 and continued until February 1987. Thus, it is undisputed that Mrozka suffered "actual injury" in all policy periods, triggering the coverage of all such policy periods. See NSP, 523 N.W.2d at 663.[11] We have determined, however, that there was no covered "occurrence" for purposes of insurance coverage for the Archdiocese after December 1980, thus, the only insurance coverage triggered are those in effect from October 1979 through December 1980: Aetna's through August 30, 1980, and Lloyd's and Interstate's commencing September 1, 1980.

Under NSP, where insurers are held consecutively liable, and there is no evidence allocating the timing of actual damages, the proper method is to allocate damages pro rata by each insurer's "time on the risk." 523 N.W.2d at 662 (citing Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980), amended, 657 F.2d 814 (6th Cir. 1981), cert. denied, 454 U.S. 1109 (1981)). Each triggered policy, therefore, bears a share of the total damages proportionate to the time period it was on the risk relative to the time period coverage was triggered. Forty-Eight Insulations, 633 F.2d at 1224. The Archdiocese must bear its share of the liability risk for the period in which it had no insurance coverage--that is, after December 1980. Id.

Adamson's abuse of Mrozka lasted 89 months, from October 1979 through February 1987. Aetna insured the Archdiocese from

_____

[11]Furthermore, as we discussed in footnote 5, supra, the court in NSP also held that in situations in which multiple policies involved where there was one continuous occurrence, the courts should apply one full SIR or limit to each separate policy period. 523 N.W.2d at 664. Thus, under the rationale set forth in NSP, the Archdiocese must assume the retained limit with respect to each of the triggered policies.

September 1979, through August 1980; thus, it is "on the risk" for eleven of 89 months. Lloyd's and Interstate insured the Archdiocese from September 1980 through December 1980, which is the time when Adamson's abuse of Mrozka was no longer an occurrence for the purposes of coverage. Thus, Lloyd's and Interstate are "on the risk" for four of 89 months.

## The Judgment Against Aetna

A judgment was rendered against Aetna for $41,422. This is not contested on appeal. The math used to reach the verdict was based on the Archdiocese being responsible for 45 percent of the state court verdict of $924,570[12] resulting in the sum of $416,056.50. When this sum is proportioned over 89 months, the allocation per month is $4,674. When multiplied by the eleven months Aetna was on the risk the overall liability is $51,422. Subtracting the Archdiocese's $10,000 SIR, the amount owed by Aetna is $41,422. Aetna contributed $127,258 as a tentative share to pay Mrozka. Therefore, it asserts that the sum owed Aetna by the Archdiocese is $127,258 less $41,422. This comes to $85,836. The district court divided this sum between the Diocese and the Archdiocese on the basis of the stipulation made by them. We find this to be error. Aetna had no contract or privity with the Diocese. Aetna was not sued by the Diocese. Aetna should receive reimbursement of the full $85,836 from its insured, the Archdiocese.

## Judgment Against Lloyd's and Interstate

Liability is pro-rated to the Archdiocese for the periods there was no insurance coverage, thus, it is liable for 75 of 89

---

[12]Excluding punitive damages, the judgment was for $821,250. With interest, the compensatory award totaled $924,570. Diocese, 858 F. Supp. at 1413.

months.  However, based upon the allocation of the four months where we find Lloyd's and Interstate covered the Archdiocese, thus the allocation of damages amounts to $4,674.79 a month, or a total of $18,699.16.  Because the SIR is triggered by the occurrence beginning in October 1980, the Archdiocese must pay the first $100,000 of the actual damage incurred during this time.  Thus, the result is that Lloyd's and Interstate incur no liability to the Archdiocese.

ATTORNEYS' FEES

The district court found the Archdiocese was not entitled to attorney fees expended in defending the underlying state action because the request for fees should have been submitted to the court during the trial seeking indemnity as part of the "ultimate net loss" to the Archdiocese.[13]  The district court concluded that such litigation expenses were not appropriately addressed in post trial motions.  The Archdiocese asserts error with the district court's denial of these expenses.  Conversely, the insurance carriers assert error in the district court's grant of expenses to the Archdiocese incurred in the declaratory judgment action seeking indemnification.

## The Underlying Litigation

Aetna fulfilled its duty to defend the Archdiocese in the state proceeding brought by Mrozka.  The Archdiocese seeks no fees

---

[13]The Diocese also raises this claim in its cross-appeal. However, as the Diocese is not entitled to any coverage because there was no occurrence under its policies, the Diocese is also not entitled to its litigation expenses in either the underlying litigation or the declaratory judgment action.  Since there was no duty to indemnify, the Diocese's insurer carriers were not liable to pay fees or expenses in the state court suit or in the declaratory judgment action.  See State Farm Fire & Casualty Co. v. Williams, 355 N.W.2d 421, 425 (Minn. 1984).

from Aetna.  The Archdiocese brought a post-trial motion against Lloyd's and Interstate for attorneys' fees expended in the underlying state court action in the form of a request for amended findings of fact and conclusions of law under Fed. R. Civ. Prob. 52(b).[14]  The Archdiocese contends error, arguing the district court's refusal to enter a judgment for defense costs is contrary to the policy language.  It is undisputed that legal fees expended by an insured may be considered part of the insured's "ultimate net loss" under the applicable insurance policies.  The issue here is whether a post trial motion was the proper vehicle to request fees.  Motions to amend a judgment cannot be used to raise arguments which could have been raised prior to the issuance of judgment.  <u>Concordia College Corp. v. W.R. Grace & Co.</u>, 999 F.2d 326, 330 (8th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 926 (1994).  The Archdiocese had ample time to produce evidence and argument regarding their legal expenses in the underlying litigation during trial, but no such evidence or argument was presented.  We, therefore, affirm the ruling of the district court.[15]

---

[14]We are perplexed by the Archdiocese's claim for attorney fees in the underlying state court action in view of the fact that Aetna provided the Archdiocese with a defense.  Although the issue is not briefed, the claim evidently is made seeking reimbursement for the Archdiocese's personal lawyer who assisted Aetna in the defense.  Such a claim is highly questionable on its merits.

[15]The Archdiocese urges it is entitled to fees under Minnesota law, citing <u>Kline v. Hanover Ins. Co.</u>, 368 N.W.2d 381 (Minn. Ct. App. 1985) and <u>SCSC Corp. v. Allied Mut. Ins. Co.</u>, 515 N.W.2d 588 (Minn. Ct. App. 1994), <u>aff'd in part, rev'd in part by</u> <u>SCSC Corp. v. Allied Mut. Ins. Co.</u>, 536 N.W.2d 305 (Minn. 1995).  The Archdiocese's reliance on the cited cases as authority on the issue of federal procedure is misplaced.  In <u>SCSC</u>, the timing of the request for attorney fees was not raised, discussed, or condoned in either the state appellate court or the supreme court opinion. Absent any discussion of the issue, there is no import to the bare fact that plaintiff's request for costs was raised in post-judgment proceedings.  In <u>Kline</u>, the plaintiff sought attorney fees incurred in a declaratory judgment action, not an underlying personal injury case, thus, <u>Kline</u> is inapposite.

Declaratory Judgment Action

     The district court granted the Archdiocese its attorneys' fees incurred in the declaratory judgment action.  The court held that expenses incurred in a declaratory judgment action against an insurer who denies coverage are properly treated as consequential expense arising out of a covered occurrence for the purposes of defining the ultimate net loss. Noting the Minnesota Supreme Court has repeatedly stated that the preferred method in Minnesota for resolving a dispute over coverage is an action for declaratory judgment, the district court stated "[a]n insurer that denies coverage and/or defense must reasonably expect that a declaratory judgment action is a likely result.  It is thus a reasonably foreseeable consequence of the occurrence itself."  Diocese of Winona v. Interstate Fire & Casualty Co., 916 F. Supp. 923, 934 (D. Minn. 1995).

     Lloyd's and Interstate argue the district court erred in interpreting the contractual language in the insurance policies to allow for the recovery of the Archdiocese's litigation expenses in a declaratory judgment action against its insurers.  We must agree.  The ultimate net loss covered by Lloyd's insuring agreements means the "total sum which the [Archdiocese] becomes obligated to pay by reason of personal injury . . . through adjudication" and includes "all sums paid as salaries, wages, compensation, fees, charges and law costs" and "expenses for . . . lawyers . . . , and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . ."  Aetna's App. at 138.  The fees in the declaratory judgment action are not recoverable, however, because the Archdiocese is attempting to assert a right to indemnification and this is not a consequence of the occurrence against which the Archdiocese insured.  Although the policy clearly intends coverage for attorneys' fees arising out of the underlying state court litigation, there is no corresponding intention expressed

concerning fees arising out of a subsequent suit seeking indemnification. Absent a "specific provision in the insurance contract itself," the insured may not recover attorneys' fees incurred in an action against the insurer to establish coverage under an insurance policy providing indemnification for losses.  Rent-A-Scooter, Inc. v. Universal Underwriters Ins. Co., 173 N.W.2d 9, 12 (Minn. 1969).  The Minnesota Supreme Court's encouragement of declaratory judgment actions extends only to those circumstances where there is a claim of a duty to defend.  See, e.g., Spicer, Watson & Carp v. Minnesota Lawyers Mut. Ins. Co., 502 N.W.2d 400, 403 (Minn. Ct. App. 1993). In the present case, the claim asserted relates to the Archdiocese's right to be indemnified, not to a duty to defend.[16]

Where a contract is breached and a suit is brought to enforce the contract, it could in some sense be said that the fees incurred are causally related to the breach.  That causal relationship, however, does not entitle the prevailing party in such a contract action on an indemnification agreement to recover fees.  See Frost v. Jordon, 36 N.W. 713, 714 (Minn. 1887) ("[I]t is against the analogies of the law to allow expenses of litigation beyond the costs allowed by statute, which, as said before, however inadequate, are the measure of indemnity which the law provides.").  Absent clear contractual language to the contrary, we hold the Archdiocese may not recover attorneys' fees expended in prosecuting

---

[16]The Minnesota Supreme Court has also stated that policy considerations dictate the award of attorneys' fees when an insured must commence a declaratory judgment action to compel coverage. The policy considerations supporting the recovery of attorneys' fees in declaratory judgment action, however, extend only to those cases where there is a duty to defend.  See Security Mut. Casualty Co. v. Luthi, 226 N.W.2d 878, 885 (Minn. 1975) ("To deny an insured the legal fees incurred in establishing coverage [when there is a duty to defend] would work a substantial hardship in many instances.  The insured would be compelled to bear litigation costs in situations where he contracted in order to avoid just such an expense.").

-26-

or defending the declaratory judgment action based on its indemnification agreement with Lloyd's and Interstate. Such clear contractual language does not exist. Having determined that attorneys' fees are not recoverable, we need not address the issue of allocation of such fees.

Thus, we hold that the judgment against Aetna for $41,422 was proper; that Aetna is entitled to reimbursement from the Archdiocese only, not the Diocese; that neither the Diocese or the Archdiocese are entitled to indemnification from Lloyd's or Interstate; and that the Diocese and Archdiocese are not entitled to attorney fees or other expenses from Lloyd's or Interstate. The case is remanded to the district court to enter judgment in accord with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.