Parks v. Roman Catholic Diocese of Burlington, Vt., Inc., No. S0999-10 CnC (Grearson, J., Oct. 18, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT
Chittenden Unit

CIVIL DIVISION
Docket No. S0999-10 CnC

DANIEL PARKS
    Plaintiff

    v.

ROMAN CATHOLIC DIOCESE OF
BURLINGTON, VERMONT, INC.
    Defendant

### RULING ON MOTION FOR SUMMARY JUDGMENT

The above-captioned case is one of several pending before this court in which an adult plaintiff—in this case, Daniel Parks—sues the Roman Catholic Diocese of Burlington, Vermont, Inc. (the Diocese) on a variety of theories, all of which stem from alleged childhood sexual abuse perpetrated upon the plaintiff by one of the Diocese's former priests—in this case, Edward Paquette.[1] Mr. Parks alleges that he has suffered a variety of long-term psychological damages as a result of the sexual abuse. Compl. ¶ 43 (filed Aug. 17, 2010). The Diocese moves for summary judgment with, broadly speaking, two categories of arguments: (1) a statute-of-limitations argument and (2) constitutional and other arguments. Plaintiff opposes the motion. The court has considered the parties' arguments in their filings as well as at oral argument held on September 25, 2012.

### BACKGROUND

The following facts are undisputed for present purposes except where noted.[2] Mr. Parks was born on August 14, 1966. He alleges that, in the late 1970s, while he was an altar boy and Edward Paquette was a priest at the Diocese, Paquette sexually abused and exploited him. Compl. ¶¶ 5–11.[3] The abuses occurred at the church, either before or after the mass in which

---

[1] Some of the other cases involving similar issues are *Whalen v. Roman Catholic Diocese of Burlington, Vermont, Inc.*, No. S1163-10 CnC, and *Dunn v. Roman Catholic Diocese of Burlington, Vermont, Inc.*, No. S1271-10 CnC. The court is also aware of another similar case currently pending in federal court captioned *Colomb v. Roman Catholic Diocese of Burlington, Vermont, Inc.*, as well as the federal court's recent ruling in that case. See No. 2:10-cv-00254, 2012 WL 4479758 (D. Vt. Sept. 28, 2012).

[2] The Diocese has filed a 79-paragraph statement of undisputed facts in support of its motion for summary judgment. In support of his opposition, Mr. Parks has filed a 150-paragraph statement. Mr. Parks' statement does not respond to the Diocese's statement paragraph-by-paragraph, which makes it somewhat more difficult to determine what facts might be in dispute. The court has done its best to make that determination. The court also presents here substantially fewer than all of the facts the parties have set forth in their statements because not all of those facts are material to the issues to be decided here.

[3] There is no dispute that these are Mr. Parks' allegations. Most of the particular details and the truth of the allegations are not material to any issue presented in the pending motion.

Mr. Parks participated as an altar boy. According to Mr. Parks, Paquette's abuse did not seem sexual to him at the time it occurred because "at that age you don't know what sex is, so you're not thinking that this is sexual activity. You're just thinking, this is weird, old people are weird." Parks. Dep. 40:12–16, Mar. 22, 2011.

Mr. Parks does not clearly remember seeing Paquette fondle other altar boys, and does not recall talking to his friends about it. By his late teens or early twenties—perhaps earlier—he realized that what Paquette had done was wrong. Ever since that realization, Mr. Parks has felt "a bit of embarrassment and shame and a bit of anger." *Id*. 53:13–54:2. Perhaps around 2001, a friend told Mr. Parks that Paquette had reached into the friend's pants in a movie theater.

It is undisputed that the Burlington Free Press ran the following stories in 2002: (1) in February, a story mentioning settlements with priests in Massachusetts suspected of sexually abusing children; (2) in April, a story that Vermont's Attorney General was investigating priests of the Diocese for abuse of minors; (3) in May, stories that the Diocese gave the attorney general the names of 20 priests accused of molesting children, and that six priests were placed on leave while allegations were investigated; (4) in October, a story about a lawsuit against the Diocese brought by Michael Bernier in July 2002, and based on allegations of sexual abuse by a priest in the Diocese. See Pl.'s Resps. to Def.'s First Reqs. to Admit ¶¶ 16, 19, 22, 26, 32. Although he does not recall specific dates, Mr. Parks read in the Burlington Free Press about several cases and several settlements involving Paquette. His reaction as he read those stories was that he had "turned out all right." Parks Dep. 66:20. Sometime around 2004 or 2005, Mr. Parks told one or both of his parents about the abuse.[4]

Mr. Parks does remember hearing or reading about Michael Gay and Perry Babel's cases involving Paquette's abuse of them, although he does not think he heard about either of those cases until after a verdict or settlement was reached. See Parks Dep. 70:13–71:15; 74:9–11. Michael Gay's case settled on April 19, 2006. See Docket No. S0748-04 CnC. The jury in Perry Babel's case returned a plaintiff's verdict on May 13, 2008, and the case was on appeal in the Supreme Court when the parties stipulated to its dismissal on January 21, 2010. See Docket No. S0274-05 CnC.

Mr. Parks decided to pursue legal action the summer of 2010. By that time he had learned about a large settlement involving other abuse victims. Parks Dep. 66:12–15. (The "large settlement" was the May 2010 settlement of twenty-six individual child sex abuse cases that were at that time pending against the Diocese.) Mr. Parks decided to sue at that time because he:

> had a realization that I didn't turn out okay. That was always my thinking was that I turned out okay, and one day I just looked in the mirror and said to myself, you did not turn out okay, look at your life, and I kind of realized that things are not like they could have been, and I feel that's because of this abuse.

---

[4] There is a substantial amount of fuzziness about when Mr. Parks told his parents. He does not recall whether he told both his parents, but if he did tell them both, it would necessarily have been before his father's death on January 1, 2005. In any case, plaintiff asserts in his memorandum in opposition that he told his parents "somewhere around 2005." Opp'n at 17.

*Id*. 65:21–66:6. The complaint in this case was filed on August 17, 2010.

ANALYSIS

I. Statute of Limitations

The statute-of-limitations analysis begins with the following provision, which is cited by both parties:

> A civil action brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within six years of the act alleged to have caused the injury or condition, *or six years of the time the victim discovered that the injury or condition was caused by that act*, whichever period expires later. The victim need not establish which act in a series of continuing sexual abuse or exploitation incidents caused the injury.

12 V.S.A. § 522(a) (emphasis added).[5] The "act" described in this particular discovery rule "may refer to the alleged act of negligence by a third party." *Turner v. Roman Catholic Diocese of Burlington, Vt.*, 2009 VT 101, ¶ 44, 186 Vt. 396 (quoting *Earle v. State*, 170 Vt. 183, 191 n.4 (1999)). The allegedly wrongful acts in this case are not the acts of Paquette himself—which occurred in the late 1970s—but are instead the acts of the Diocese in hiring and retaining Paquette, allegedly failing to prevent the abuse, and allegedly conspiring to cover up the abuse. In addition, the Legislature's use of "discover" in § 522 builds upon the "discovery rule," and therefore incorporates an objective standard. See *Earle*, 170 Vt. at 192. Thus, the date of accrual in this case is the point at which a reasonable person in Mr. Parks' position should have discovered the basic elements of a cause of action: an injury caused by the negligence or breach of duty of the Diocese. See *id*. at 193.

The Diocese asserts that Mr. Parks had all the information he needed no later than 2002 (the year the Free Press ran the stories mentioned above, and the year Michael Bernier brought his lawsuit). According to the Diocese, under *Turner*, Mr. Parks was on inquiry notice of a claim against the Diocese. The Diocese further asserts that the court should reach that conclusion as a matter of law because there is no legally sufficient evidentiary basis for a reasonable jury to find for Mr. Parks on this issue. Mr. Parks' allegation that he realized in summer 2010 that he did not turn out okay is, according to the Diocese, a subjective discovery only, and the test is what a reasonable person should have known. Mr. Parks concedes that the Diocese can point to facts that might cause a jury to determine that he should have inquired earlier, but maintains that the limitations issue remains for the jury.

---

[5] Section 522(a) contains a retroactivity provision that effectively reduces its six-year limitations period to the three-year limitations period in § 512(4) in cases where the act of sexual abuse and the discovery that the injury or condition was caused by the act of sexual abuse occurred prior to July 1, 1984. See *Turner v. Roman Catholic Diocese of Burlington, Vt.*, 2009 VT 101, ¶¶ 37, 44, 186 Vt. 396 (explaining retroactivity provision and the distinction between the retroactivity provision's discovery rule and § 522's discovery rule). In this case, the Diocese does not argue for the shortened three-year limitations period.

The court agrees that this is a jury issue. "[T]he determination of when a claim accrues is generally a question reserved for the trier of fact . . . ." *Turner*, 2009 VT 101, ¶ 48. However, "it is appropriate for a court to determine the issue when there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party on that issue." *Id.* In *Turner*, the plaintiff brought suit against the Diocese in 2004, alleging negligent hiring, training, supervision, and retention of a priest—in that case, Alfred Willis—who sexually assaulted Turner in 1977. *Id.* ¶ 2. Turner opposed the Diocese's motions for summary judgment motion and judgment as a matter of law by relying on the plaintiff's statements that he was unaware that his mental health problems were caused by the sexual abuse, or the potential liability of the Diocese, until after 1998. *Id.* ¶¶ 38, 39. The trial court denied the motion, *id.* ¶ 40, and denied the defense's motion for judgment as a matter of law on the statute-of-limitations issue, *id.* ¶ 41. However, after the jury indicated in its verdict that the Diocese had proven its statute-of-limitations defense, the plaintiff moved for judgment as a matter of law, arguing that there was no evidence to support the jury's finding that Turner knew, or should have known, of the Diocese's responsibility prior to September 2, 1998. *Id.* ¶ 41. The court granted the motion, reasoning that "knowing a priest breached a duty does not, per se, tip off the reasonable person that the diocese had also breached a duty." *Id.* ¶ 42. The Supreme Court concluded that, in that case, it would have been inappropriate for the trial court to determine the statute-of-limitations issue as a matter of law one way or the other. *Id.* ¶ 56 (adopting the "middle ground": send the issue to the jury).

Notably, the Supreme Court's analysis concerned the third of a three-part inquiry into when Mr. Turner knew (or should have known) of: (1) his molestation; (2) harm resulting from that molestation; and (3) responsibility of the Diocese. *Id.* ¶ 47. Of course, there is no way for a plaintiff to conclude that the Diocese might be responsible for harm resulting from molestation until the plaintiff knows (or should know) that he was molested and that he suffered harm as a result. Here, Mr. Parks concedes that he knew he was molested by his late teens or early twenties. He has testified, however, that he did not know of harm resulting from that molestation until 2010.[6] In his words, it was not until 2010 that he realized that he "didn't turn out okay" and came to feel that he did not turn out okay "because of this abuse." If the jury agrees, then there was no way that Mr. Parks (or anyone in his position) could have known that the Diocese might be responsible until 2010 at the earliest. All of the discussion in *Turner* about what a plaintiff might know about the Diocese's responsibility is academic if the plaintiff does not even know that his injuries resulted from the molestation.

Determining the time at which Mr. Parks knew or should have known that he was harmed by the molestation is a jury issue. It was a jury issue in *Turner*; in that case, Mr. Turner had testified that he was unaware that his mental health problems were caused by the sexual abuse until 2002. *Id.* ¶ 39. The jury in that case concluded that Mr. Turner *did* know that he was harmed by the molestation prior to September 2, 1998. *Id.* ¶ 41. (That then raised the question of whether he necessarily also should have known that the Diocese might be liable.) The jury's finding in *Turner* does not affect this case, however—Mr. Parks' jury will need to hear his testimony and other evidence to decide when he knew or should have known that he was harmed as a result of the molestation.

---

[6] The fact that Mr. Parks felt embarrassment, shame, and anger ever since he realized that he was molested does not necessarily mean that he realized that he had the serious injuries he alleges in his complaint.

4

The Diocese has gone to great lengths to discuss earlier cases brought against it and the fact that those cases received attention in the local media. How that media attention affects the analysis of the third prong—whether Mr. Parks had or should have obtained information sufficient to put a reasonable person on notice that the Diocese might be liable—is an interesting question not addressed in *Turner*. At first blush, the court is inclined to think that the presence of such ample news reporting about cases against the Diocese would alter the *Turner* analysis, since there would then be tangible basis for a reasonable plaintiff who knew he was injured by a priest's abuse to consider suing the Diocese.[7] The court need not rule on that question in this case at this time, however, because it puts the cart (prong three) before the horse (prong two): it is necessary to make a finding about when Mr. Parks knew or should have known that his injuries resulted from the molestation before delving into the question of whether a reasonable person with that knowledge might think the Diocese is liable.

The media attention also seems relevant to the second prong of the analysis. One might argue that, having seen or been aware of those reports—which, after all, were about individuals claiming to have been harmed by childhood sexual abuse—Mr. Parks should have known that he, too, was harmed by the molestation. The court concludes that that might be a good argument to make to the jury, but that it does not mean that there is no evidentiary basis for a jury to find that Mr. Parks did not discover or should not have discovered the cause of his alleged problems until more recently.[8] A reasonable person might know that he was abused, might know that he had problems, and might know that others had sued the Diocese for problems caused by abuse, but the person might still not connect the abuse to his particular problems. Whether or not a reasonable person should make that connection depends on the particular circumstances of each case.

Because it concludes as it does, the court does not need to reach Mr. Parks' alternative claim based on 12 V.S.A. § 555.

## II. The Diocese's Constitutional and Other Arguments

The remaining bases for the Diocese's motion for summary judgment are mostly constitutional arguments. The court takes up each argument in turn.

---

[7] This is especially so in this case because here, unlike in *Turner*, the abuse occurred on church premises while the priest was acting as a representative of the church.

[8] The Diocese latches on to and criticizes plaintiff's statement in his opposition that "Mr. Parks will explain why he did not inquire earlier . . . ." Opp'n at 18. It is true that a party opposing summary judgment is not entitled to a trial on the basis of a hope that he can produce some evidence at that time. 10A Wright, Miller, Kane, & Marcus, Federal Practice and Procedure: Civil 3d § 2727 (WL updated Apr. 2012). Here, however, Mr. Parks has asserted that prior to summer 2010 he was unaware that his problems were caused by the sexual abuse. This is not a "hope" of evidence, it is evidence, and Mr. Parks is entitled to present it and elaborate upon it at trial.

5

## A. The First Amendment

After reciting the First Amendment's Establishment and Free Exercise Clauses, and the religious autonomy doctrine, the Diocese asserts that:

> [T]he continued exposure to damages (including punitive damages) makes it highly likely that the tort system will put the Diocese out of existence. If the protections of the First Amendment are to mean anything, the government (through the mechanism of the tort system) should not be allowed to shut the doors of a church and put it up for sale.

Mot. for Summ. J. at 22. The Diocese points out that the civil judgments that have been entered against it in previous priest sex-abuse cases are larger than the criminal fines Paquette himself could have been liable for under the criminal law. At the same time, the Diocese notes that in these civil cases it has not benefitted from the protections that a criminal defendant, such as the prohibition on double-jeopardy and a heightened standard of proof. The Diocese maintains that its financial ruin at the hands of tort plaintiffs is unacceptable under the First Amendment, and seeks either dismissal or what it calls a "middle ground" in which the court grants to the Diocese criminal law protections, including the criminal standard of proof and a requirement that, to be liable, its Bishop during the relevant time period have acted with criminal intent and malice.

In opposition, Mr. Parks asserts that (to summarize): (1) the Vermont Supreme Court in *Turner* has already held that the First Amendment does not bar claims of this type; (2) the First Amendment cases the Diocese cites do not stand for the proposition it says they do; (3) the Diocese's assertion about going out of existence is speculative, especially because (a) the amounts the Diocese has paid to resolve prior priest sex-abuse cases are not as large as the Diocese says they are; (b) the Diocese may be covered by insurance; and (c) because in any case the Diocese may avail itself of the U.S. Bankruptcy Code.

In reply, the Diocese argues that Mr. Parks "misses the import of the constitutional concern" raised in its motion. Reply at 13. According to the Diocese, Mr. Parks has not addressed its contention "that open-ended exposure to potentially crippling judgments has as much of a chilling effect on freedom or religion as on freedom of speech." *Id*. at 15 (citing *Sullivan*). Bankruptcy, says the Diocese, is not a means of protecting against constitutional violations.

The court concludes that the Diocese's argument is speculative and premature—it rests on a chain of assumptions, including whether a jury would find the Diocese liable, whether it would award damages, how much any such damages might be. Moreover, even if the court could entertain such a speculative premise, the Diocese's argument fails on its merits. "The First Amendment provides, in relevant part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Turner*, 2009 VT 101, ¶ 26 (quoting U.S. Const. amend. I). Although the First Amendment refers only to Congress, "[t]he prohibitions contained in the First Amendment apply to the states by operation of the Fourteenth Amendment." *Id*. (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

In *Turner*, the Diocese argued that "allowing plaintiff to pursue a negligent hiring claim against it would violate the Free Exercise Clause because in order to assess the reasonableness of defendant's decision to ordain Willis, the court has to pass judgment on an ecclesiastical decision." *Id*. ¶ 25. The Diocese also argued that "allowing plaintiff to pursue a negligent supervision claim transgresses both the Free Exercise and Establishment Clauses and the religious autonomy doctrine because the supervision of clergy is inextricably rooted in religious doctrine and belief." *Id*. The Supreme Court considered and rejected the Diocese's arguments in that case based on the Free Exercise Clause, the Establishment Clause, and the religious autonomy doctrine. *Id*. ¶¶ 27–35.

Although the Diocese cites the Free Exercise and Establishment Clauses and the religious autonomy doctrine in Mr. Parks' case, the Diocese's arguments in this case are different than the arguments the Supreme Court rejected in *Turner*. In this case, the Diocese is arguing that its exposure to tort law unconstitutionally threatens to suppress religion by crippling the Diocese's infrastructure, thereby depriving the Catholic faithful of the free and unhindered exercise of religion. The First Amendment analysis in *Turner* is therefore not precisely on point with respect to the issue the Diocese raises here.

In support of its argument, the Diocese relies upon *New York Times Co. v. Sullivan*. In that case, the New York Times Company ran a full-page advertisement on March 29, 1960 entitled "Heed Their Rising Voices," referring to the rising voices of civil rights demonstrators in the South. 376 U.S. 254, 256 & app. A (1964). One of the elected Commissioners of the City of Montgomery, Alabama, L. B. Sullivan, brought a civil libel suit against the New York Times and others, alleging that, since he supervised the Montgomery Police Department, certain statements in the advertisement that were critical of police conduct were directed at him. See *id*. at 257. Under Alabama law at the time, there was no defense or privilege for libelous words against a public official, save for proof that the words were true. *Id*. at 267. In fact, some of the statements that the Commissioner challenged were not accurate descriptions of events that occurred in Montgomery. *Id*. at 258. A jury in Alabama state court awarded Mr. Sullivan $500,000 in damages, and the Supreme Court of Alabama affirmed. *Id*. at 256.

The Supreme Court of the United States reversed, holding that "the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action brought by a public official against critics of his official conduct." *Id*. at 264. It was not enough that the Alabama law allowed the defense of truth, since requiring critics to guarantee the truth of their assertions on pain of libel judgments would lead to self-censorship inconsistent with the First and Fourteenth Amendments. *Id*. at 279. Neither was the Court convinced that injury to public officials' reputations could justify repressing speech. *Id*. at 272. Noting that Alabama had a criminal libel law, the Court went on to say that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." *Id*. at 277. The Court remarked that:

> Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive. Plainly

7

the Alabama law of civil libel is "a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law."

*Id*. at 278 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

Mr. Parks' case does not involve the same free speech / freedom of the press issue as in *Sullivan*, nor does it come within the narrow holding of that case, which concerns a state's power to award damages "for libel in actions brought by public officials against critics of their official conduct." *Id*. at 283. Moreover, the risk of tort judgments against the Diocese does not come from a law that fails to provide sufficient safeguards for freedom of religion. Alabama's civil libel law was constitutionally defective because it effectively compelled the critic of official conduct to guarantee the truth of all of his factual assertions. In a democracy that demands vigorous public debate—including debate on the actions of public officials—the chilling effect of such a law is unacceptable.

The lesson from *Sullivan* was not that the Constitution requires courts to supply additional protections to tort defendants (even defendants that play important roles in our society such as newspapers and churches) in cases where repeated lawsuits threaten them financially. A careful reading of the Supreme Court's statement block-quoted above reveals that the Court's concern was not that a newspaper might fail from a succession of judgments. *Regardless* of whether the newspaper could survive the repeated judgments, the constitutional problem was a law that, by its very existence, chilled speech. If Alabama's civil libel law had included a provision requiring the plaintiff to prove actual malice, it would not have had the unconstitutional chilling effect. And if a parade of plaintiffs successfully sued the New York Times under a civil libel law that *did* require such proof, the newspaper could not point to potential financial ruin as a defense. In contrast to Alabama's civil libel law, this court can not see anything about the existence of the Vermont tort laws at issue in this case that infringe on the establishment, free exercise, or autonomy of religion. This was implicit in *Foster v. Roman Catholic Diocese of Vermont*, in which the Court stated that immunity or exemption from tort liability for religious societies is not required by the Constitution. 116 Vt. 124, 137 (1950).

More specifically, the Establishment Clause "prohibits government action that tends to endorse, favor, or in some manner promote religion." *Turner*, 2009 VT 101, ¶ 31. Courts use the three-prong *Lemon* test[9] to evaluate Establishment Clause cases. *Id*. To pass the *Lemon* test, government action must have a secular purpose, its primary effect must not enhance or inhibit religion, and it must not foster an excessive government entanglement with religion. *Id*. Here, as in *Turner*, the Diocese does not contend that a judicial inquiry in these types of claims serves any purpose other than a secular purpose. Neither is there any excessive entanglement because the claims are "not measured against canon law, but rather against secular legal standards." *Id*. ¶ 32. What the Diocese seems to be arguing is that the effect of tort law in this case inhibits religion. While the application of tort law has undoubtedly harmed the Diocese, its primary effect is not to inhibit religion. The primary effect of the tort laws at issue here is to prevent neglect of duty. See *id*. ("The duty owed by defendant to protect minors from sexual abuse is not different from the duty owed by other institutions to which the common law applies."); *Foster*,

---

[9] Referring to *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

116 Vt. at 134 ("Neglect of duty should be prevented, not encouraged."). That is a neutral principle that applies to all actors, religious or otherwise.

Similarly, the Free Exercise Clause "guarantees the freedom to hold religious beliefs and the freedom to act in accordance with those beliefs." *Turner*, 2009 VT 101, ¶ 27. However, "[t]o be protected under the Free Exercise Clause, the conduct that the state seeks to regulate must be 'rooted in religious belief.'" *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Here, as in *Turner*, there is no indication that the law at issue is anything "other than a neutral law of general applicability or that it is directed specifically towards a religious belief or practice of the defendant." *Id.* ¶ 28. Finally, the relevant circumstances of this case are not materially different from the circumstances in *Turner* that were insufficient to shield the Diocese from accountability for negligence under the religious autonomy doctrine. See *id.* ¶ 34. In short, none of the First Amendment tests involve an inquiry into the consequences of any potential exposure to liability.

## B. Due Process

### 1. Timeliness / Unavailability of Evidence

The Diocese argues that trying this case would deny it due process, generally because the case involves conduct that occurred thirty-five years ago. Specifically, the Diocese argues that there is a due process violation here because: (1) its key witness, Bishop Marshall, has been dead for nearly two decades, and many other witnesses have passed away or have diminished memories, and (2) the Diocese cannot properly investigate plaintiff's claims because plaintiff's pediatric records are unavailable.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Generally, this provision requires "at least some legal procedure in which the person proceeded against, if he is to be concluded thereby, shall have an opportunity to defend himself." *Bioni v. Haselton*, 99 Vt. 453, 457 (1926) (quoting *In re Gannon*, 18 A. 159, 160 (R.I. 1889)).

The due process implications of a delay in legal action appear in the criminal context, and the court turns to that realm for guidance here. To begin, this argument is somewhat reminiscent of the Diocese's statute of limitations argument (discussed *supra*). Indeed, one of the policies underlying the statutes of limitations is fairness to defendants, and ensuring that they not be deprived of the ability to defend because evidence is no longer available. *Inv. Props., Inc. v. Lyttle*, 169 Vt. 487, 490 (1999). "The statute of limitations, however, is not the sole measure of whether a prosecution is timely." *State v. Delisle*, 162 Vt. 293, 312 (1994) (citing *United States v. Marion*, 404 U.S. 307, 325–26 (1971)). "A defendant may successfully avoid prosecution if the preindictment delay violated defendant's due process rights." *Id.* (citing *United States v. Lovasco*, 431 U.S. 783, 789–90 (1977)). "Prosecution will be barred where the delay violates those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . and which define the community's sense of fair play and decency." *Id.* (quotations omitted). "In making this inquiry, courts should consider the reasons for the delay and the actual prejudice to the defendant." *Id.*

9

Here, in the context of the statute-of-limitations issue, the jury will decide the reasons for Mr. Parks' delay. If the jury agrees with the Diocese on that issue, then there will be no need to delve into the constitutional question. If the jury agrees with the plaintiff, then the delay was unavoidable, and that part of the due process inquiry favors the plaintiff. As for prejudice, it is the Diocese's burden to show actual prejudice attributable to the passage of time. *Delisle*, 162 Vt. at 313. It has failed to do that. The Diocese does not explain why Bishop Marshall's absence prevents it from defending this case but did not prevent it from defending in *Turner*. Nor does the court believe that the absence of Mr. Parks' pediatric records prejudices the defense so severely that it rises to a constitutional level—as the parties' lengthy statements of fact demonstrate, ample facts are available to both sides.

## 2. Alleged Unconstitutionally Variable Damages

The Diocese argues that the courts have imposed widely varying compensatory and punitive damage awards against it in some of the previous cases brought by the adult victims of childhood sexual abuse. The Diocese says that "the unpredictability of the tort scheme leaves it no way of assessing its financial exposure though the consequences are considerably more severe than any criminal sanctions." Opp'n at 32. According to the Diocese, the tort system as it is applied in these cases is akin to a criminal statute that is void for vagueness or otherwise runs afoul of the fair warning requirement.

"Statutes and, by extension, regulations, are unconstitutionally vague when they either (1) fail to provide sufficient notice of what conduct is prohibited, or (2) authorize or encourage arbitrary and discriminatory enforcement by failing to provide explicit standards." *In re Rusty Nail Acquisition, Inc.*, 2009 VT 68, ¶ 12, 186 Vt. 195. The Diocese has not cited, and the court has not found, any authority for the proposition that the common law could be void for vagueness. Even if it could, the Diocese's argument on this point is meritless. Although many of the abuse cases brought against the Diocese shared some similar legal issues, the standard for the award of damages—both compensatory and punitive—does not change, even though the answer to what damages to award for each case is different, depending on the unique facts of each case. In other words, it is a question for the factfinder. Damage awards that are clearly excessive (or inadequate) are treated under the rules of procedure. See Restatement (Second) of Torts, div. 13, ch. 47, *Note on Excessive and Inadequate Damages* (noting that the whole matter of excessive or inadequate damages is regarded as procedural). The court addresses additional questions regarding punitive damages in the discussion immediately below.

## C. Punitive Damages

The Diocese first argues that Mr. Parks is able to assert his claim for punitive damages because of the retroactivity provision in 12 V.S.A. § 522, and that the retroactive imposition of punitive damages raises a serious constitutional question. It is true that in *Landgraf v. USI Film Products*, the U.S. Supreme Court stated that "[r]etroactive imposition of punitive damages would raise a serious constitutional question." 511 U.S. 244, 281 (1994). Specifically, the question that would be raised is whether assessing punitive damages against the Diocese violates the "principle that the legal effect of conduct should ordinarily be assessed under the law that

existed when the conduct took place." *Id*. at 265. In *Landgraf*, the Civil Rights Act of 1991 created a new right to recover punitive damages for intentional discrimination violative of Title VII. The new law did not explicitly authorize punitive damages for preenactment conduct, but if it had, then the *ex post facto* problem would have loomed, since the defendant's conduct in that case occurred prior to the 1991 law's enactment. See *id*. at 281.

This case is different than *Landgraf* because no law retroactively made punitive damages available where they were not available before. The retroactivity provision in § 522 has nothing to do with the availability of punitive damages. The provision did not retroactively make punitive damages available—all it does is make § 522's six-year limitations period applicable to certain causes of action commenced on or after July 1, 1990. *Turner*, 2009 VT 101, ¶ 37. If § 522 does not apply, then a three-year limitations period applies instead. *Id*. Punitive damages were available in negligence cases even before § 522 was enacted. E.g., *Wheeler v. Cent. Vt. Med. Ctr., Inc.*, 155 Vt. 85, 96–97 (1989) (recognizing potential for punitive damages against Hospital, although concluding that the plaintiff in that case had not demonstrated malice).

The Diocese's next argument on this topic is a public policy argument. The Diocese maintains that punitive damages should not be awarded because its current, innocent, membership—rather than any wrongdoer—would have to bear the burden of paying those damages. As the Diocese points out, a similar rationale appears in the context of suits seeking punitive damages against public entities, and in that context the general rule is that punitive damages are not allowed unless expressly authorized by statute. See *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 n.1, 263 (1981) (recognizing general rule that no punitive damages are allowed against municipal corporations unless expressly authorized by statute, and noting that the rationale for the rule is that "such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised"); see also D. Dobbs, Remedies § 3.9, at 217–18 (1973) (discussing punitive liability of public entities).

The short answer to the Diocese's public policy argument is that, unlike the rule for public entities, "[t]here is no common law rule exempting religious or non-profit organizations from punitive damages awards." *Mrozka v. Archdiocese of St. Paul and Minneapolis*, 482 N.W.2d 806, 810 (Minn. Ct. App. 1992). The rule is not that no organization—which is composed of constituents, some of whom may be innocent—can be liable for punitive damages. If that were the case, then, for example, corporations could never be liable for punitive damages, since the award might affect stock prices and harm stockholders who are not themselves the wrongdoers. This court concludes, as did the *Mrozka* court, that the municipal exception from punitive damages in *City of Newport* is distinguishable from the Diocese's proposed exemption for religious organizations. *Id*. Even if the general rule insulating public entities from punitive damages did extend to religious organizations, this class of cases would fall into the exception for "serious misconduct" in which punitive damages may be appropriate. See D. Dobbs, Remedies § 3.9, at 218.

Next, the Diocese argues that it has been punished enough in the course of prior sex-abuse lawsuits, and that it has since taken steps to "put its house in order"—i.e., to prevent this kind of abuse from happening again. The court concludes that both of those arguments are arguments that can be made to the jury, but neither argument compels the court to take the issue

11

from the jury.  As for prior punishments, the Restatement explains that they may be taken into account as the jury determines the amount of punitive damages, and whether such damages should be given at all:

> Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards.

Restatement (Second) of Torts § 908 cmt. e.  Similarly, since one of the purposes of punitive damages is deterrence, the issue of the Diocese's recent efforts to prevent further abuse may bear on the question of specific deterrence.  Even if the jury concluded that no further specific deterrence function would be served by awarding punitive damages, it could, depending on the evidence, reasonably conclude that some punishment might still be in order, or that a punitive award might still serve a general deterrence function.  Again, if the jury does award any punitive damages, the usual procedural rules are available to correct any such award that might be excessive.  See *id*. § 908 cmt. d.

Finally, the Diocese argues that imposing further punitive damages would violate the Eighth Amendment's prohibition against "excessive fines" and "cruel and unusual punishments." U.S. Const. amd. VIII.  However, the Eighth Amendment, by its terms and context, is limited in applicability to criminal punishments.  *Coty v. Ramsey Assocs., Inc.*, 149 Vt. 451, 468 (1988).  It is true, of course, that "[t]he Due Process clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454 (1993)).  There is no basis for the court to conclude that this case (as opposed to some earlier case or some later case) represents some sort of cutoff at which point the imposition of punitive damages crosses the constitutional line.  Indeed, the fact that the law permits the jury to consider issues such as the Diocese's prior payments and efforts to prevent further abuse suggests that there is a built-in system to prevent the sort of "grossly excessive" punishment that would be unconstitutional.  If this case goes to a jury and the jury returns a punitive damage award that is beyond the pale, the court will take corrective action.

ORDER

The Diocese's motion for summary judgment is denied.

Dated at Burlington this ___ day of October 2012.

_____
Brian Grearson
Superior Court Judge

12